## UNITED STATES BANKRUPTCY under
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE:                                    )
                                          )
CYBER DEVELOPMENT GROUP                   )          No. 13 B 34214
INTERNATIONAL, LLC                        )
                                          )
              Debtor.                     )

## ORDER APPROVING BIDDING PROCEDURES

This matter came to be heard by this Court on Cyber Development Group International, LLC's (the "Debtor") Motion for Order Approving Sale Procedures for the sale of the Debtor's Assets (the "Motion") requesting entry of an order approving the bidding procedures (the "Bidding Procedures") attached hereto as **Exhibit 1** with respect to the proposed sale of the Debtor's assets (the "Assets"), as more fully set forth in that certain asset purchase agreement (the "Form APA"); and it appearing that notice of the Motion is appropriate under the circumstances and that no other or further notice need be given; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT**:

1.      The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved and fully incorporated into this Order, and shall apply with respect to the proposed sale of the Assets.  The Asset Purchase Agreement of the Stalking Horse referred to in **Exhibit 1** is appended as **Exhibit 3** hereto, provided that the Bid Protection provided therein is by this Order reduced from $250,000 to $150,000.

2.      The marketing plan set forth in the *Marketing of Cyber Development Group International, LLC and CRC 1331 BCD Mt. Prospect, LLC's Assets* (the "Marketing Plan") attached hereto as **Exhibit 2** is approved and fully incorporated into this Order, and shall be

sufficient and proper notice to any other interested parties.  All parties in interest shall retain their right to object to the sufficiency of the marketing process at the hearing to approve the sale of the Assets.

3.    Each Secured Party is hereby deemed a Qualified Bidder and shall be entitled to credit bid all or a portion of its claims against the Debtor, up to the value of such Secured Party's interest in the Assets, without otherwise complying with the Bidding Procedures, to the fullest extent permissible under Section 363(k) of the Bankruptcy Code.

4.    The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

5.    All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of the Bankruptcy Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Assets.

6.    Any sale of the Assets and rejection, assumption, and/or assignment of any executory contract or unexpired lease to which either of the Debtors is a counterparty shall be subject to such counterparties' rights pursuant to Section 363 and 365 of the Bankruptcy Code. The entry of these Bidding Procedures shall not be deemed to constitute approval of any sale and/or the rejection, assumption, and/or assignment of any contract or lease; rather, any sale, rejection, assumption, and/or assignment shall be approved only upon further order of the Bankruptcy Court.

7.    All objections to the relief requested in the Motion with respect to the Bidding Procedures that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

8.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

9.    Notwithstanding the possible applicability of Federal Rule of Bankruptcy Procedure 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

10.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order and the Bidding Procedures.

Dated:  October 16, 2013

OCT 1 6 2013

_____
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| CYBER DEVELOPMENT GROUP | ) | Case No. 13-B-34214 |
| INTERNATIONAL, LLC | ) | |
| | ) | Hon. Jack B. Schmetterer |
| Debtor. | ) | Room 682 |
| | ) | Hearing Date: September 30, 2013 |
| | ) | Hearing Time: 10:30 a.m. |

### BIDDING PROCEDURES

1.      On August 28, 2013, Cyber Development International, LLC ("**CDGI**") filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division ("**Court**") seeking to reorganize under Chapter 11 of the Bankruptcy Code. Since then, CDGI has continued in the possession, management and operation of its assets, properties and businesses in accordance with Sections 1107 and 1108 of the Bankruptcy Code.

2.      On August 30, 2013, CDGI's affiliated company, CRC1331 BCD Mt. Prospect, LLC ("**CRC1331**," and together with CDGI, the "**Debtors**"), filed a voluntary petition in the Court seeking to reorganize under Chapter 11 of the Bankruptcy Code as Case No. 13-B-34691. Since then, CRC1331 has been managing its assets as a debtor-in-possession.

3.      CDGI is a limited liability company organized and existing under the laws of the State of Illinois, where it was organized on January 16, 2007. CDGI is a manager-managed limited liability company with AOP Investments, LLC and John Pressman as its duly appointed and acting managers. CDGI is engaged in the business of managing all telecommunications business activities at 1331 Business Commerce Dive, Mt. Prospect, Illinois ("**1331 Property**"), including managed infrastructure, managed hosting, colocation and private cloud computing.

4.      CRC1331 is the owner in fee simple of the 1331 Property.

1

**EXHIBIT 1**

5.    CDGI is the Master Lessor of the 1331 Property, in turn, leasing space and telecom equipment (including servers and collocation "racks") to CDGI's connectivity customers.

6.    The Debtors are seeking a sale of the assets (the "**Assets**") described in the Stalking Horse APA (as defined below) in one common transaction. They assert that it is not feasible to sell the assets of one Debtor without selling the assets of the other Debtor; and in short, it is only feasible to sell the 1331 Property and the customer contracts of CDGI in one common transaction.   That said, the Debtors will entertain offers for their respective assets separately.

7.    On September 24, 2013, CDGI filed its Motion For Order Approving Sale Procedures For The Sale of the Debtor's Assets ("**Bidding Procedures Motion**"), seeking, among other things, approval of bidding procedures for the solicitation of offers or proposals (each a "**Bid**") for the acquisition of the Assets.

8.    On October 15, 2013, the Debtors entered into an asset purchase agreement (the "**Stalking Horse APA**") with Customer First Colo, LLC (the "**Stalking Horse Bidder**"), pursuant to which the Stalking Horse Bidder proposed to acquire the Assets for the amount of $2,250,000 (the "**Stalking Horse Bid**"), which Stalking Horse Bid is conditioned upon (a) a due diligence period of three (3) weeks from the date of entry of the Bidding Procedures Order (defined below), (b) a break-up fee of $100,000 (the "**Break-Up Fee**"), and (c) a bid protection of $250,000 (the "**Bid Protection**").   The Stalking Horse Bid shall be deemed a Qualified Bid (as defined below), and is subject to competitive bidding as set forth herein.   On or prior to November 6, 2013, the Stalking Horse Bidder shall send a notice to the Debtors, and the Debtors

2

shall transmit a notice to all possible Bidders (as defined below), advising as to whether it will move forward with the Stalking Horse Bid.

9.      On October ___, 2013, the Court entered an order (the "**Bidding Procedures Order**") approving the following bidding procedures (these "**Bidding Procedures**") for obtaining Bids for the acquisition of the Assets:

   A.   Assets for Sale.  The Debtors are soliciting offers for all or a portion of the Assets.

   B.   Bidding Deadlines.  All Bids must be submitted in accordance with the terms of these Bidding Procedures so that they are actually received by each of the Notice Parties (as defined below) no later than 10:00 a.m. (CDT time) on November 8, 2013 (the "**Bid Deadline**").  Written copies of the Bids shall be delivered by the applicable deadline to (collectively, the "**Notice Parties**"): (a) the Debtors c/o Patrick Shutt, Chief Restructuring Officer of the Debtors, Dunham & Black, 233 S. Wacker Drive, Suite 8400, Chicago, Illinois, pcs@dunhamblack.com, telephone: 312-283-8061 (the "**CRO**"); (b) counsel to the Debtors, Ariel Weissberg, of Weissberg and Associates, Ltd., 401 South LaSalle suite 403, Chicago, Illinois 60091, ariel@weissberglaw.com; (c) counsel for Libertyville Bank and Trust Company (the "**Bank**"), Douglas Lipke, Vedder Price P.C., 222 North LaSalle Street, Chicago, Illinois 60601, dlipke@vedderprice.com; (d) counsel for Therm Flo, Inc., Zonatherm, Inc., ThermFlo Profit Sharing Trust, and the Albert & Patricia Izzo Trust, Bryan E. Minier, Pedersen & Houpt, 161 North Clark Street, Suite 3100, Chicago, Illinois 60601, bminier@pedersenhoupt.com; and (e) counsel for Pinnacle Services, Inc. ("**Pinnacle Services**," and together

3

with the Bank, the "**Secured Parties**"), Bruce de'Medici, BDM Law Group, 834

North Forest Avenue, Oak Park, Illinois 60302, bdemedici@bdmlawgroup.com.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as

defined below). A Bid shall be delivered to all Notice Parties at the same time.

Interested bidders requesting information about the qualification process,

including a copy of the Stalking Horse APA, and information in connection with

their due diligence, should contact the CRO.

C. Designation as Qualified Bidder. To participate in the Auction (as defined

below), a party, other than the Stalking Horse Bidder, submitting a Bid (including

a Portion Bidder (as defined below)) (a "**Bidder**") must submit a Bid that is

determined by the Debtors and the Secured Parties (as defined below), subject to

final determination by the Court, to satisfy each of the following conditions (a

"**Qualified Bid**").

(i) Written Submission of Modified APA and Commitment to Close. Bidders

(other than the Secured Parties) must submit a Bid by the Bid Deadline in

the form of an executed mark-up of the Stalking Horse APA (each, a

"**Modified APA**") reflecting such Qualified Bidder's proposed changes to

the Stalking Horse APA (together with a blackline of the Modified APA

against the Stalking Horse APA), and a written and binding commitment

to close on the terms and conditions set forth therein;

(ii) Irrevocable. A Bid must be irrevocable until the sooner of (a) forty-five

(45) days after the Court authorizes and approves the Successful Bid, and

(b) the closing date of the transaction with the Successful Bidder or Back-

CHICAGO/#2494284.12

Up Bidder (both terms as defined below) (the "**Termination Date**");
provided, however, that in the event the Stalking Horse Bidder withdraws
the Stalking Horse Bid, all Bidders may withdraw or amend their
respective Bids on or prior to the Bid Deadline;

(iii) Contingencies. A Bid may not be conditional on obtaining financing or
any internal approval or on the outcome or review of due diligence. Any
other contingencies associated with a Bid may not, in aggregate, be
materially more burdensome than those set forth in the Stalking Horse
APA;

(iv) Financing Sources and Evidence of Financial Ability to Close. A Bid
must identify the actual Bidder and owners of the Bidder and contain
written evidence of a commitment for financing or other evidence of the
ability to consummate the sale on or before the Closing Date satisfactory
to the Debtors and the Secured Parties with appropriate contact
information for such financing sources;

(v) No Fees Payable to Qualified Bidder. A Bid may not request or entitle the
Qualified Bidder (other than the Stalking Horse Bidder) to any break-up
fee, expense reimbursement, or similar type of payment;

(vi) Good-Faith Deposit. Each Bid (including the Stalking Horse Bid) must be
accompanied by a cash deposit (the "**Good Faith Deposit**") in an amount
equal to five (5%) percent of the cash purchase price allocated to the
Assets under the Modified APA, which shall be paid to Chicago Trust

Company, pursuant to a joint order escrow between CDGI and the Bidder ("**Escrow**"), to be held in trust in accordance with these Bidding Procedures;

(vii)    <u>Minimum Initial Bid</u>.  The aggregate consideration in a Bid must have a cash purchase price for the Assets of equal to or greater than the sum of (a) the amount payable for the Assets under the Stalking Horse Bid, and (b) the Bid Protection (the "**Minimum Initial Bid**"); and

(viii)    <u>Non-cash Consideration</u>.  Bids may not include non-cash consideration.

D.   <u>Secured Lenders may Credit Bid</u>.  The Secured Parties are each deemed a Qualified Bidder.  Notwithstanding any provision to the contrary herein, the Secured Parties, and the Stalking Horse Bidder, are entitled, pursuant to Section 363(k), to credit bid all or a portion of the secured amount of their respective claims against the Debtors (to be determined by the Court, if necessary), without otherwise complying with these Bidding Procedures.  In the event any Secured Party elects to credit bid all or a portion of its claim against the Debtors, such Secured Party's Bid, regardless of amount, shall be deemed a Qualified Bid, including a Secured Party submitting a credit bid as a Portion Bid.  The Secured Parties also shall be entitled to all information generally available to other Potential Bidders.

E.   <u>Portion Bidders</u>.  A party (including a Secured Party) who does not wish to purchase all or substantially all of the Assets (a "**Portion Bidder**") may submit a

6

CHICAGO/#2494284.12

Bid in respect of a subset of such assets (a "**Portion Bid**") and shall constitute a Qualified Bidder if such Portion Bid satisfies the requirements in paragraph C above;

F. <u>Due Diligence From Bidders</u>. Each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtors regarding such Bidder and its contemplated transaction. Failure by a Bidder to comply with requests for additional information will be a basis for the Debtors to determine that the Bidder is not a Qualified Bidder.

G. <u>Auction</u>. In the event more than one Qualified Bid is received by the Bid Deadline, the Debtors shall conduct an auction (the "**Auction**") to determine (in consultation with the Secured Parties) the highest and/or best Bid with respect to the Assets. The Auction shall commence on November 12, 2013, at 1:30 p.m. (Central Time), in Courtroom 682 of the Dirksen Federal Building, 219 South Dearborn Street, Chicago, Illinois 60604.

In the event only one Qualified Bid is received by the Bid Deadline, then the Auction shall not take place, and the Debtors will instead seek approval of, and authority to consummate, such Qualified Bid and the transactions provided for therein at the Sale Hearing (as defined below).

If least one Qualified Bid is received by the Bid Deadline, the Auction shall be conducted according to the following procedures:

7

(i) <u>Participation At The Auction</u>.  Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction; provided that the Debtors may allow any or all Portion Bidders that are Qualified Bidders to participate in the Auction.  For greater certainty, the Stalking Horse Bidder is a Qualified Bidder and eligible to participate at the Auction. Only the authorized representatives (including counsel and other advisors) of each of the Qualified Bidders, the Debtors, the Secured Parties, and other creditors who have filed appearances in the Court shall be permitted to attend at the Auction.  The bidding shall begin with the highest Qualified Bid (the "**Opening Bid**") and each subsequent round of bidding shall continue in minimum increments of at least $50,000 (the "**Minimum Overbid Increment**").  For greater certainty, a combination of Portion Bids (an "**Aggregated Bid**") which, when totaled, exceed the Minimum Initial Bid may be determined to be the Opening Bid;

(ii) <u>Debtors Shall Conduct The Auction</u>.  The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall provide the terms of the Opening Bid to all participating Qualified Bidders at the Auction.  The determination of which Qualified Bid constitutes the Opening Bid shall be done in consultation with the Secured Parties and take into account any factors the Debtors (in consultation with the Secured Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors, including, among other things, the following:   (i) the amount and nature of the consideration; (ii) the

8

proposed assumption of any liabilities, if any; (iii) the ability of the
Qualified Bidder to close the proposed transaction; (iv) the proposed
closing date and the likelihood, extent and impact of any potential delays
in closing; (v) any purchase-price adjustments; (vi) the impact of the
contemplated transaction on any actual or potential litigation; (vii) the net
economic effect of any changes from the Stalking Horse APA, if any,
contemplated by the contemplated transaction documents (the
"**Contemplated Transaction Documents**") (but this subparagraph
9(G)(ii) is not to be construed as modifying subparagraph 9(C)(i) above,
(viii) the net after-tax consideration to be received by the Debtors; and
(ix) such other considerations as the Debtors deem relevant in their
reasonable business judgment (collectively, the "**Bid Assessment
Criteria**"). All Bids made after the Opening Bid shall be Overbids (as
defined below), and shall be made and received on an open basis, and all
material terms of each Overbid may be fully disclosed to all other
Qualified Bidders that are participating in the Auction. The Debtors shall
maintain a transcript of the Opening Bid and all Overbids made and
announced at the Auction, including the Successful Bid and the Back-Up
Bid;

(iii) Terms of Overbids. An "**Overbid**" is any Bid made at the Auction
subsequent to the Debtors' announcement of (i) the Opening Bid, and
(ii) the then highest and/or best Overbid at the beginning of each
subsequent round of bidding (the "**Round Leading Bid**"). To submit an

9

Overbid, in any round of the Auction, a Qualified Bidder must comply with the following conditions:

1. <u>Minimum Overbid Increment</u>.   Any Overbid shall be made in increments of at least the amount of the Minimum Overbid Increment.  The amount of the Cash Purchase Price of any Overbid shall not be less than the Cash Purchase Price of the Opening Bid or the Round Leading Bid, as applicable.

2. <u>Remaining terms are the same as for Qualified Bids</u>.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until the Termination Date.

The Debtor shall credit the amount of the Bid Protection to each and every Overbid submitted by the Stalking Horse Bidder at the Auction, meaning that if the Stalking Horse Bidder's subsequent Overbid is the Round Leading Bid, any subsequent Overbid or Aggregated Bid (but not any particular Portion Bid) must exceed the Stalking Horse Bidder's Overbid by the amount of the Bid Protection and the Minimum Overbid Increment.

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must

10

submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(iv) <u>Announcing Overbids</u>.  At the start of each round of bidding, the Debtors shall announce the material terms of the Round Leading Bid, the basis for calculating the total consideration offered in such Overbid, and the resulting benefit to the Debtors' based on, among other things, the Bid Assessment Criteria.  For greater certainty, an Aggregated Bid may be determined to be the Round Leading Bid.

(v) <u>Consideration of Overbids</u>.  Subject to an Order of the Court, the Debtors reserve the right (in consultation with the Secured Parties), in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things:  (A) facilitate discussions between the Debtors and individual Qualified Bidders; (B) allow individual Qualified Bidders to consider how they wish to proceed; (C) consider and determine the current highest and/or best Overbid at any given time during the Auction; and (D) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as they may require, in their reasonable business judgment, that the Qualified Bidder has obtained all required internal corporate approvals, has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding

11

commitments, to consummate the proposed transaction at the prevailing Overbid amount.

(vi) <u>Portion Bids</u>.  Subject to an Order of the Court, notwithstanding the foregoing, each Portion Bidder entitled to participate in the Auction shall be entitled to submit an Overbid (in a minimum increment to be determined by the Debtors) with respect to any portion of the Assets without being required to submit an Overbid with respect to all the Assets or all assets subject to the Round Leading Bid; provided that in order for an Aggregated Bid to be considered a Round Leading Bid, the Aggregated Bid shall be subject to these Auction procedures as is any other Overbid, including that such Aggregated Bid shall be subject to the Minimum Overbid Increment; and

H.  <u>Closing the Auction</u>.  Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (in consultation with the Secured Parties) (i) immediately review the final Overbid of each remaining Qualified Bidder on the Bid Assessment Criteria, and (ii) identify the highest and/or best Overbid or Opening Bid (the "**Successful Bid**" and the entity or entities submitting such Successful Bid, the "**Successful Bidder**"), and the next highest and/or best Overbid or Opening Bid after the Successful Bid (the "**Back-Up Bid**" and the entity or entities submitting such Back-Up Bid, the "**Back-Up Bidder**"), and advise the remaining Qualified Bidders of such determination.  One or more Portion Bid(s) can form part of a Successful Bid and Back-Up Bid so long as such Portion Bid(s) do not overlap in respect of the Assets sought to be purchased and

12

in such case, such Portion Bidder(s) shall be included in the definition of Successful Bidder (or Back-Up Bidder), as applicable.

10. <u>Consent to Jurisdiction as Condition to Bid</u>.  All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the  Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable. Qualified Bidders shall not be deemed third party beneficiaries of these Joint Bidding Procedures and shall not have standing to object to the Debtors' implementation thereof.

11. <u>Sale Hearing</u>.  The Debtors shall request that the Court schedule a hearing to approve the sale of Assets to the Successful Bidder by no later than November 19, 2013 at 10:30 a.m. (the "**Sale Hearing**"), at which the Debtors shall seek entry of an Order, among other things, authorizing and approving the proposed transaction with the Successful Bidder. The Debtors will be deemed to have accepted the Successful Bid only when the Successful Bid has been approved by the Court.

Following the approval of the sale to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate the sale in accordance with the terms and conditions of the Contemplated Transaction Documents of the Successful Bidder, the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, as the Successful Bid and the Debtors shall be authorized, but not required, to consummate the sale with the Back-Up Bidder, subject to approval of the Court, which approvals may be sought by the Debtors on a conditional basis at the Sale Hearing, at the Debtors' discretion.

13

12. <u>Break-Up Fee</u>.  In the event that the Stalking Horse Bidder is not the Successful Bidder or does not become the Successful Bidder after originally being designated as the Back-Up Bidder, the Break-Up Fee in the amount of $100,000 shall be paid to the Stalking Horse Bidder from the proceeds received upon closing of the Successful Bid or the Back-Up Bid.  The obligation of the Debtors to pay the Break-Up Fee shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever.  In the event the Break-Up Fee is not paid from the proceeds of the sale upon closing, the Stalking Horse Bidder may seek, upon motion and notice, a superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which claim shall not be subject to the objection of the Debtors or the Bank.

13. <u>"As Is, Where Is"</u>.  The sale of the Assets, which sale is subject to approval of the Court, pursuant to these Bidding Procedures shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description except to the extent as expressly stated in the Stalking Horse APA or the Contemplated Transaction Documents of another Successful Bidder.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, conditions or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except

14

as expressly stated in these Bidding Procedures or the Contemplated Transaction Documents of such Qualified Bidder.

14. <u>Free Of Any And All Encumbrances and Interests</u>.    At the Sale Hearing, except as otherwise provided in the Successful Bidder's Contemplated Transaction Documents, the Debtors shall seek Court approval that all of the Debtors' right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, and other than any permitted encumbrances under the Successful Bidder's Contemplated Transaction Documents, the **"Encumbrances and Interests"**) in accordance with the Stalking Horse APA, if applicable, and the vesting orders of the Court, with such Encumbrances and Interests to attach to the net proceeds of the sale of the Assets.    These Bid Procedures are not to be construed as approval by the Court of any sale free and clear of Encumbrances and Interests or  predilection for it to grant that approval.    The Purchase Price shall be paid, held, and distributed in accordance with orders of the Court, respectively, approving the sale or sales.

15. <u>Return or Application of Good Faith Deposit</u>.    Good Faith Deposits of all Qualified Bidders shall be held in a separate non-interest-bearing account or escrow unless otherwise agreed between the parties.    Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder shall be returned to such Qualified Bidders two (2) business days after the selection of the Successful Bidder and Back-Up Bidder.    Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at closing.    The Good Faith Deposit of the Back-Up Bidder shall be held in an interest-bearing account until two (2) business days after the

15

closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-Up Bidder. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit of the Successful Bidder as part of their damages resulting from the breach or failure to perform by the Successful Bidder. If the Successful Bidder fails to consummate an approved sale for any reason, and a transaction is completed with the Back-Up Bidder, the Good Faith Deposit of the Back-up Bidder shall be applied to the purchase price of the transactions contemplated by the purchase agreement of the Back-Up Bidder at closing.

16. <u>Modifications and Reservations</u>. Subject to the Bidding Procedures Order and approval of the Court, the Debtors shall have the right to adopt such other rules for these Bidding Procedures (including rules that may depart from those set forth herein), that in their reasonable business judgment will better promote the goals of these Bidding Procedures; provided that the adoption of any rule that materially deviates from these Bidding Procedures shall require the prior consent of the Secured Parties and the Stalking Horse Bidder, or orders of the Court.

Subject to approval of the Court, the Debtors may (after consultation with the Secured Parties and the Stalking Horse Bidder) prior to or during the Auction, adopt such additional rules for the Auction that will better promote the goals of the Auction and that are not inconsistent with the provisions of these Bidding Procedures and the Bidding Procedures Order; provided that the adoption of any rule for the Auction that materially deviates from the Auction procedures set forth in these Bidding Procedures shall require the prior consent of the Secured Parties or orders of the Court.

16

Subject to approval of the Court, the Debtors may (after consultation with the Secured Parties) reject at any time before entry of an order of the Court approving a Successful Bid, any Bid that is (a) inadequate or insufficient, or (b) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures (as may modified in accordance with the provisions thereof).

**CYBER DEVELOPMENT GROUP
INTERNATIONAL, LLC and CRC1331 BCD
MT. PROSPECT, LLC,** Debtors


By:    /s/ Ariel Weissberg
         One of their attorneys

Ariel Weissberg, Esq. (No. 03125591)
Rakesh Khanna, Esq. (No. 06243244)
Weissberg and Associates, Ltd.
401 S. LaSalle St., Suite 403
Chicago, IL  60605
T. 312-663-0004
F. 312-663-1514

17

## MARKETING OF CYBER DEVELOPMENT GROUP INTERNATIONAL, LLC AND CRC1331 BCD MT. PROSPECT, LLC'S ASSETS

### I.    INTRODUCTION

Cyber Development Group International, LLC ("CDGI") and CRC1331 BCD Mt. Prospect, LLC ("CRC1331") recently filed voluntary petitions to initiate Chapter 11 bankruptcy cases ("Companies"). These cases are pending in the Bankruptcy Court in Chicago. It is the Companies' intention to sell their assets pursuant to an auction sale, pursuant to Section 363 of the Bankruptcy Code to the highest and best offeror. CDGI operates in the data center market which is a multi-billion dollar global market place where customers "collocate" by housing their mission critical data and connectivity equipment at CDGI's data center. The customers store and compute data from CDGI's data center to run their mission critical information and technology systems. The data center market is considered to be quite lucrative because at present the demand for new high-quality centers is high.

CDGI operates a data center at 1331 Business Center Drive in Mt. Prospect, Illinois ("Data Center"). This real property is owned by CRC1331, with CDGI as the "master lessor." The Data Center is approximately 6 years old with a square foot print of approximately 35,000 feet. The useable space is approximately 75% of the total square feet and a present about 65% of the center is occupied by tenants.

The Data Center today generates approximately $3.1m in revenue and is positive from and EBITDA perspective. The Companies have approximately $18.5m in debt that is split between four primary creditors. Prior to the initiate of the bankruptcy cases, the Companies and their creditors were unable to resolve amicably on claims. As such the Companies have sought protection in bankruptcy to achieve a transaction to sell the Companies' assets for highest and best offeror.

### II.    MARKETING PLAN

The Companies team of advisors, professionals and management will advance the marketing of the following:

1.    Prepare detailed due diligence package will be posted into a data room for review by prospective investors/ acquirers. A copy of the due diligence list is attached hereto as Exhibit 1.

2.    Soliciting funds, investment bankers and companies involved in owning, funding or managing data centers, including the following but not limited to:

    (a)    Private Equity Funds
    (b)    Family Office Funds
    (c)    High Net- Individuals
    (d)    Turn-Around Funds
    (e)    Debt investors
    (f)    Special Situation investors

**EXHIBIT 2**

(g)    Strategic investors that include Data Center Operating Companies:  Core Site, Telx, Equinix, DRT, Cyrus One, Lattisys, Data Realty, Red Sea Group to name a few

(h)    Integration Telecom Businesses:  Telecom companies that have data centers:  Century Link Savvis, Level 3, ATT and Verizon Terramark to name a few.

The Companies will then provide guided tours, Q & A sessions as well as access to the data room after a Non-Disclosure Agreement ("NDA") is executed. A copy of the proposed NDA is attached hereto as Exhibit 2.

The Companies will solicit bids from the prospects, with the best offeror to become the stalking horse bid.

Once the stalking horse bid is in place the Companies will approach the market with the terms to determine if other interested prospects will "overbid" to acquire the asset in an auction sale through the Bankruptcy Court.

## III.    RISKS

The key risk to a robust auction is the fact that a there are two data centers in close proximity, with Cyber Workplace Recovery Services, LLC owning one at 1221 Business Commerce Drive, Mt. Prospect, Illinois, and the second data center owned by Zayo' Core Link, which is one-half mile away.  Both of these data centers compete for customers.  As such, potential suitors will have concerns about the competitive landscape.

The other major risk is that the customers of CDGI are uncommitted to remaining at the Data Center for the term of their contracts.  It should be noted that the major clients are very concerned at this stage and are looking for the Companies to stabilize quickly through a sale process to a qualified and competent Company that will maintain or improve on their service levels, as well as invest in the Data Center to bring it into full compliance.   If this is not done quickly, it is the Companies' feeling that customers may seek to terminate their contracts, leaving the Data Center at a greatly diminished value.

## IV.    MARKETING TO DATE

Prior to and post entering Chapter 11, the Companies have held numerous conversations to try to broker offers with the following entities:  Down Town Capital Management, Callibration Partners, Zarcone Family, Tannebaum Capital, Chrystal Capital, Ingalls and Snyder, Bank Street Capital, D H Capital, Promus Private Equity as well as Zayo, Data Realty, Nitel and Root Access,  Zayo, Data Realty, Nitel, Root Axccess, Cushman & Wakefield, Data Realty, Energy Investment Fund, Interconnect Miami, Zonatherm, Thermflo, Owen Schnaper, Trapp Technology Partners, Colliers International, CP Highlands Acquisitions, and Ilissa Miller Public Relations, who in turn, will send a marketing piece to global data center owners and managed service providers, targeted to approximately 600 prospects. At this stage the Companies remain in early stages of dialogue.

2

# EXHIBIT 1

List of CDGI due diligence:

1. 1331 Floor Plan
2. Art Duquette promissory note 9/25/07
3. Pinnacle settlement agreement 12/23/11
4. Excelon MSA 5/25/10
5. Zayo service order form 7/10/13
6. Verizon facility usage agreement 2/12/08
7. CDGI investment offering memorandum by CBRE
8. 2010 - 2012 financials
9. Comcast sales order form 5/15/12
10. Izzo promissory note 12/23/11
11. Izzo promissory note 9/30/11
12. Izzo promissory note 7/18/11
13. Thermflo promissory not 4/28/11
14. Izzo promissory note 4/22/11
15. Libertyville Bank loan amendment 7/19/11
16. Libertyville Bank promissory note 7/19/11
17. Libertyville Bank commercial guaranty 7/16/11
18. Libertyville Bank amendment to guaranty 7/19/11 – Jack Pressman
19. Libertyville Bank amendment to guaranty 7/19/11 – Anna Pressman
20. Libertyville Bank subordination and intercreditor agreement 7/19/11 - Pinnacle
21. Libertyville Bank subordination and intercreditor agreement 7/19/11 - Fortress
22. Libertyville Bank modification of mortgage 7/19/11
23. Libertyville Bank subordination and attornment agreement 7/19/11
24. Steve Keyser employment contract – 6/21/11
25. Therm Flo maintenance agreement – 2/29/12
26. Zonatherm lease schedules
27. Therm Flo lease schedules
28. Libertyville Bank
    a. $900K term loan note by borrower
    b. Amendment to forbearance agmt and loan/secur agmt
    c. Commercial guaranty – John Pressman
    d. Commercial guaranty – Anna Pressman
    e. Subordination and attornment agreement
    f. Subordination agreement with Clarion Construction
    g. Subordination agreement with Fortress International
    h. Subordination agreement with Pinnacle Services
    i. Subordination agreement with Izzo Trust
    j. AOP paid notes SKMBT
    k. CRC paid notes SKMBT
    l. Commercial guaranty with AOP investments
    m. Subordination agreement Izzo Trust
    n. Subordination agreement Threm Flo
    o. Modification to mortgage
    p. Paid lease AOP

29. Travelers E&O certificate
30. First amendment to Aptar collocation agreement 11/14/11
31. Aptar collocation agreement 5/31/08
32. Misc. letters to Aptar
33. Computer Onsite rack agreement 7/3/7
34. Computer Onsite amendment to master service agreement 9/15/08
35. Computer Onsite 2013 invoices
36. Equivoice collocation agreement
37. Equivoice change orders
38. Equivoice 2013 invoices
39. Huron
    a. Letter related to Ch. 11
    b. 2nd amendment to master services agreement
    c. 1st amendment to master services agreement
    d. Master services agreement 10/2/07
    e. Change orders
    f. 2013 invoices
40. Katten Muchin Rosenman
    a. 1st amendment to collocation agreement 7/29/08
    b. Colocation agreement 7/29/08
    c. Change orders
    d. 2013 invoices
41. Strategic Hotels
    a. Colocation agreement
    b. 2013 invoices
42. CDGI master services agreement – NMHS
43. CDGI master services agreement – CWRS
44. CDGI property insurance certificate
45. CDGI liability insurance certificate
46. Commission Agreement with PaceTel, Inc.

4

**ASSET PURCHASE AGREEMENT**

**dated as of October 15, 2013**

**among**

**Customer First Colo, LLC,**

**as Purchaser,**


**and**

**Cyber Development Group International, LLC**

**and CRC1331 BCD Mt. Prospect, LLC,**

**as Sellers**

**EXHIBIT 3**

# TABLE OF CONTENTS

**Page**

ASSET PURCHASE AGREEMENT ..................................................................1
ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION.......................1
 1.1  Definitions. ........................................................................1
 1.2  Rules of Construction. .......................................................9
ARTICLE II PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES ............9
 2.1  Purchase and Sale of Assets. ............................................9
 2.2  Assignment and Assumption of Liabilities ....................11
 2.3  Excluded Assets.................................................................12
 2.4  No Other Liabilities Assumed .........................................12
 2.5  Deemed Consents .............................................................13
 2.6  Obligations in Respect of Assumed Executory Contracts ....................13
ARTICLE III BASIC TRANSACTION .............................................................13
 3.1  Payment of Purchase Price ...............................................13
 3.2  Further Assurances ...........................................................13
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS .............14
 4.1  Sellers' Representations and Warranties..........................14
 4.2  Validity of Agreement ......................................................14
 4.3  Organization, Standing and Power ...................................14
 4.4  No Conflicts.......................................................................14
 4.5  No Consents ......................................................................14
 4.6  Legal Proceedings.............................................................15
 4.7  Intentionally omitted.........................................................15
 4.8  Title to Property ................................................................15
 4.9  Brokers...............................................................................15
 4.10  Intellectual Property ........................................................15
 4.11  Limitations .......................................................................15
ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER....................16
 5.1  Organization ......................................................................16
 5.2  Authority............................................................................16
 5.3  No Conflicts or Violations................................................16
 5.4  Brokers...............................................................................16
 5.5  Confidentiality ..................................................................16
 5.6  Investigation ......................................................................16
 5.7  No Other Representations or Warranties ..........................16
ARTICLE VI COVENANTS OF SELLERS; OTHER AGREEMENTS........................17
 6.1  Consents and Approvals....................................................17
 6.2  Access to Information and Facility...................................17
 6.3  Conduct of the Business Pending the Closing...................17
 6.4  Notification of Certain Matters.........................................18
 6.5  Further Assurances ...........................................................18
 6.6  Bankruptcy Actions ..........................................................18
 6.7  Stalking Horse; Solicitation of Transactions ....................19
 6.8  Confidentiality; Non-Disclosure......................................20

6.9     Other Bids ...................................................................................................20
6.10    Excluded Assets and Liabilities .................................................................20
6.11    Intentionally omitted .................................................................................20
6.12    Taxes ..........................................................................................................20
ARTICLE VII COVENANTS OF PURCHASER .......................................................21
7.1     Assumed Obligations .................................................................................21
7.2     Operation ...................................................................................................21
7.3     Further Assurances ....................................................................................21
7.4     Post-Petition Financing .............................................................................21
7.5     Confidentiality; Non-Disclosure ...............................................................21
ARTICLE VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ...........22
8.1     Warranties True as of Both Present Date and Closing Date; Covenants ..............22
8.2     Bankruptcy Condition ................................................................................22
8.3     Material Adverse Change ...........................................................................24
8.4     Litigation ...................................................................................................24
8.5     Approvals ...................................................................................................24
8.6     Closing Certificate ....................................................................................24
8.7     Post-Petition Obligations ...........................................................................24
8.8     Financing ...................................................................................................24
8.9     Due Diligence ............................................................................................24
ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS ...................25
9.1     Warranties True as of Both Present Date and Closing Date ......................25
9.2     Bankruptcy Court Approval .......................................................................25
9.3     Litigation ...................................................................................................25
9.4     Approvals ...................................................................................................25
9.5     Closing Deliveries .....................................................................................25
ARTICLE X CLOSING ..............................................................................................26
10.1    Closing .......................................................................................................26
10.2    Deliveries by Sellers ..................................................................................26
10.3    Deliveries by Purchaser .............................................................................27
10.4    Form of Instruments ..................................................................................27
ARTICLE XI TERMINATION; TERMINATION PAYMENT ....................................27
11.1    Termination ................................................................................................27
11.2    Breakup Fee; Refund of Good Faith Deposit ............................................28
11.3    Effect of Termination or Breach ................................................................29
ARTICLE XII ADDITIONAL POST-CLOSING COVENANTS .................................29
12.1    Employees ..................................................................................................29
12.2    Joint Post-Closing Covenants of Purchaser and Sellers ...........................30
12.3    Certain Consents ........................................................................................30
12.4    Post Closing Operating of Sellers; Name Changes ...................................30
12.5    Accounts Receivable; Collections .............................................................30
12.6    Tax Matters ................................................................................................30
ARTICLE XIII MISCELLANEOUS ...........................................................................31
13.1    Survival ......................................................................................................31
13.2    Expenses ....................................................................................................31
13.3    Amendment ................................................................................................31

13.4    Notices ...................................................................................................31
13.5    Waivers ..................................................................................................32
13.6    Counterparts and Execution...................................................................32
13.7    SUBMISSION TO JURISDICTION......................................................32
13.8    Governing Law .......................................................................................33
13.9    Binding Nature; Assignment ..................................................................33
13.10   No Third Party Beneficiaries...................................................................33
13.11   Construction............................................................................................33
13.12   Public Announcements ...........................................................................33
13.13   Entire Understanding..............................................................................34
13.14   Closing Actions ......................................................................................34
13.15   Conflict between Transaction Documents...............................................34

## SCHEDULES

| | | |
|---|---|---|
| Schedule 2.1(a)(iii) | - | Assumed Executory Contracts |
| Schedule 2.1 (xiv) | - | Excluded Permits and Licenses |
| Schedule 2.3(e) | - | Additional Excluded Assets |
| Schedule 4.5 | - | Necessary Consents |
| Schedule 4.9 | - | Brokers |
| Schedule 4.10 | - | Intellectual Property |
| Schedule 6.3 | - | Employees (Pre-Closing) |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of October 15, 2013, by and among Customer First Colo, an Illinois limited liability company, or its assignee ("Purchaser"), and Cyber Development Group International, LLC ("CDGI") and CRC1331 BCD Mt. Prospect, LLC, ("CRC", and with CDGI, each, a "Seller" and collectively, "Sellers").

In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Definitions.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" shall have the meaning set forth in Section 2.1(a) hereof.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law) of which Sellers are or has been a member.

"Agreement" means this Asset Purchase Agreement, including all the Schedules hereto, as the same may be amended, modified or waived from time to time in accordance with its terms.

"Allocation" shall have the meaning set forth in Section 12.6 hereof.

"Alternative Transaction" means any transaction occurring after the Bidding Procedures Order is entered involving the consummation of the sale pursuant to section 363(b) of the Bankruptcy Code of any, all or a material portion of the Business by Sellers to a purchaser or purchasers other than Purchaser and/or one or more of its Affiliates at any time during the pendency of the Bankruptcy cases.

"Aptar Assets" means any and all property owned by AptarGroup, Inc. that may be located or stored at 1331 East Business Center Drive, Mount Prospect, IL, 60056.  Without limiting the foregoing, such term includes (a) any and all servers, storage, appliances, switching, and general computer equipment located in that certain cage, located inside the 1331 building in "Data Center B", used by Aptar, (b) any and all storage boxes, cables, chairs, tables, and similar office equipment located in the office space within the Aptar cage, and (c) those certain quantity 4 two-post racks identified as racks 4.2, 4.3, 5.2. and 5.3; provided, that "Aptar Assets" does not include the racks owned by CDGI (i.e., the racks other than those identified in subsection (c) of

**EXHIBIT 3**

this sentence), the power distribution strips in the racks and the thermal monitors plugged into the PDUs, the overhead cable trays, the patch panel (located to the right corner, after entering the cage) hanging on the wall to provide network connections into the Aptar cage, the large fire suppression tank located in the Aptar cage, the overheard cooling systems located in the Aptar cage, the power circuits that are being delivered to the individual racks (including the breaker boxes on the walls on the right side of the cage), nor the cage walls and office walls.

"Assignment and Assumption" shall have the meaning set forth in Section 10.2(g) hereof.

"Assumed Executory Contracts" means all Contracts and Leases identified in Schedule 2.1(a)(iii).

"Assumed Obligations" shall have the meaning set forth in Section 2.2(a) hereof.

"Assumed Post-Petition Obligations" shall have the meaning set forth in Section 2.2(b).

"Auction" shall mean the auction conducted by Sellers pursuant to the Bidding Procedures Order and Section 8.2(c) hereof for all or substantially all of the Acquired Assets.

"Bankruptcy Cases" means the cases of Sellers under chapter 11 of the Bankruptcy Code, pending in the Bankruptcy Court as Case No. 13-34214 and 13-34691 and jointly administered under the former case number.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois.

"Bid" or "Bids" shall have the meaning set forth in Section 6.9 hereof.

"Bidders" shall have the meaning set forth in Section 6.9 hereof.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in the form reasonably acceptable to Purchaser which includes, among other things, (i) the Breakup Fee, to be paid out of the proceeds of any Alternative Transaction, or, if not paid out of any such proceeds, as an obligation of Sellers having super-priority as an administrative expense in the Bankruptcy Cases, (ii) Purchaser's designation as the stalking horse bidder together with the provisions of this Agreement to be performed by Sellers before the Closing, (iii) the Purchase Price Protection, (iv) scheduling the Auction in accordance with the terms of this Agreement, (v) scheduling the Sale Hearing, (vi) providing for competitive bidding procedures pursuant to which competing offers may be solicited, made and accepted and containing the terms specified in Sections 8.2(c) and 11.2 hereof and (vii) approving and implementing the provisions of Sections 6.6, 6.7, 8.2(c) and 11.2 hereof.

"Books and Records" means all documents, contracts, records and lists of Sellers including: (i) all records relating to past or present customers, suppliers or personnel of Sellers

(including customer lists, mailing address lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers and any other written or electronic identifiable data relating to past or present customers or suppliers of the Business or personnel of Sellers which has been created by Sellers or their representatives, agents or employees), all records relating to all product, business and marketing plans of Sellers, all manuals, warranties, contracts to which either of Sellers is a Party, all documents relating to the Facility, all documents relating to any equipment owned by either of Sellers, and (ii) all books, ledgers, files, reports, plans, drawings and operating records of every kind of Sellers; provided, however, "Books and Records" shall not include any records exclusively related to the Excluded Assets or Sellers' minute books, stock books and Tax Returns.

"Breakup Fee" shall have the meaning set forth in Section 8.2(c)(i) hereof.

"Business" means the business activities carried on by or on behalf of Sellers.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" shall have the meaning set forth in Section 10.1 hereof.

"Closing Date" shall have the meaning set forth in Section 10.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which either Seller is a party and which Sellers are permitted under the Bankruptcy Code and applicable law to assume and assign other than an Employee Benefit Plan.

"Copyright Assignment" means a copyright assignment in form and substance reasonably satisfactory to Purchaser.

"Disclosure Schedules" shall have the meaning set forth in Section 4.1 hereof.

"Dollars" or "$" means dollars of the United States of America.

"Excluded Assets" shall have the meaning set forth in Section 2.3(b) hereof.

"Excluded Contracts" shall have the meaning set forth in Section 2.3(b) hereof.

"Excluded Environmental Liabilities" means any Liability or investigatory, corrective or remedial obligation, arising under Environmental Laws with respect to either Seller or any predecessor or Affiliate of either Seller, arising out of or relating to the operation, use or environmental condition of the Business, the Acquired Assets or the Facility prior to the Closing (including any arising from the on-site or off-site Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of, or exposure to Hazardous Substances) whether or not

constituting a breach of any representation or warranty herein and whether or not set forth on any Disclosure Schedule.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4 hereof.

"Facility" means the premises owned by CRC at which CDGI operates the Business, namely that certain real property described hereto in Exhibit A.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Good Faith Deposit" shall have the meaning set forth in Section 3.1(a).

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Highest or Best Bid" shall have the meaning set forth in Section8.2(c)(vi) hereof.

"Huron Assets" means any and all property owned by Huron Consulting Services LLC ("Huron") that may be located or stored at 1331 East Business Center Drive, Mount Prospect, IL, 60056. Without limiting the foregoing, such term includes: (a) any and all servers, storage, appliances, switching, cabinets, and general computer equipment located in certain rooms, located inside the 1331 Building in Data Center C, D and E, and the open basement, used by Huron (the "Huron Rooms"), (b) any and all cabinets, racks, power distribution, cable management, storage boxes, cables, chairs, tables, kitchen and similar office equipment located in the office space within the designated rooms. Huron Assets includes the racks and the thermal monitors plugged into the PDUs, the overhead cable trays, the patch panels hanging on the wall to provide network connections into the Huron Rooms, the large fire suppression tank located in the Huron Rooms, the overheard cooling systems located in the Huron Rooms, the power circuits that are being delivered to the individual racks including the breaker boxes on the walls. Additionally the outside furniture including the grill, security chain, and picnic table are Huron Assets.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any indebtedness and (vii) all

prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) inventions (whether or not patentable or reduced to practice), all improvements thereto, and patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, reexaminations and counterparts thereof; (ii) trademarks, service marks, trade dress, logos, slogans, trade names, internet domain names, corporate names and all other indicia of origin, together with all translations, derivations and combinations thereof, and together with all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) works of authorship (whether or not copyrightable), and copyrights, mask works and copyrightable works, and applications, registrations and renewals in connection therewith; (iv) trade secrets, know-how and other confidential, proprietary or business information (including ideas, research and development, formulas, compositions, manufacturing, production and other processes and techniques, methods, designs, technical and other data, charts, plans, diagrams, drawings and specifications, customer and supplier lists and business, marketing and other plans, studies and proposals); (v) computer software (including source code, executable code data, databases and documentation) and systems; (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium; (vii) all other intellectual property and proprietary rights; and (viii) the right to sue and recover for any past, present or future infringement, misappropriation, dilution or any other causes of action, and to recover or collect any damages, proceeds, income, royalties or other payments in connection with or relating to any of the foregoing.

"Intellectual Property Assignments" means the Trademark Assignment and the Copyright Assignment.

"Inventory" means all inventory of any kind or nature owned by Sellers, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, and fuels and other and similar items.

"Knowledge of Sellers" shall mean the actual knowledge of Jack Pressman, Patrick Schutt, Christopher Swenson, Steve Keyser, Chris Brandt, Tammie Owens or Jorge Fernandez.

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority, or common law.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), Order of any

Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Purchaser is a successor, transferee or continuation of Sellers or the Business, and (iv) any leasehold interest, license or other right, in favor of a Third Party or a Sellers, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Change" or "Material Adverse Effect" means any event, condition, development or effect that individually or in the aggregate with all other events, changes, conditions, developments and effects, is or is reasonably likely to be materially adverse to (i) the Acquired Assets or (ii) the ability of Sellers to perform their obligations under this Agreement, provided, however, that none of the following shall be deemed in and of itself, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Change or a Material Adverse Effect: (a) changes in economic conditions generally or in the industry in which Sellers operate, except to the extent such changes have a disproportionate effect on Sellers or Purchaser, (b) any change of Law, accounting standards or regulatory policy, (c) changes or adverse conditions in the securities markets, including those relating to debt financing, except to the extent such changes have a disproportionate effect on Sellers or Purchaser, and (d) any actions specifically required to be taken pursuant to this Agreement. For the avoidance of doubt, the customers identified on Exhibit B shall be deemed "material" and the loss of any of such customers, or the written communication by any of such customers (to either of Sellers, the Debtors or Purchaser) that such customer(s) intend to terminate, or not renew on terms similar to those currently in place, their existing contracts with CDGI, shall be deemed a Material Adverse Change, except to the extent that such contracts are terminated at the request of Purchaser.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Sellers in the usual and ordinary course in a manner substantially similar to the manner in which Sellers operated, consistent with past practice prior to the commencement of the Bankruptcy Cases.

"Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Permitted Liens" means easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Post-Petition Accounts Payable" shall mean post-petition trade account payables incurred in the Ordinary Course of Business and other post-petition current Liabilities incurred in the Ordinary Course of Business. Post-Petition Accounts Payable shall not include Liabilities arising from breach of contract, breach of warranty, tort, infringement or other violation of the rights of another Person (including any Intellectual Property rights), lawsuits or violation of Law.

"Post-Petition Employee Compensation" shall mean post-petition obligations with respect to any unpaid wages, salary, unused vacation or sick leave earned and accrued (to the extent not paid) with respect to the Rehired Employees.

"Proceeding" means any claim, charge, complaint, dispute, demand, action, investigation, inquiry, audit, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, arbitration, account, contribution, and/or other causes of action of whatever kind or character.

"Property Tax Credit" shall mean a credit against the Purchase Price for (a) the unpaid 2012 real estate taxes payable in 2013 (the "2012 Taxes") and (b) the 2013 real estate taxes payable in 2014 (the "2013 Taxes"), prorated as of the Closing Date, based upon an estimated tax equal to one hundred and five percent (105%) of the 2012 Taxes. The proration of real estate taxes between the parties at Closing shall be final and shall not be subject to readjustment.

"Purchase Price" shall have the meaning set forth in Section 3.1(a) hereof.

"Purchase Price Protection" means bid protection as approved by the Bankruptcy Court which shall require any competing initial bid from a third party purchaser (other than Purchaser) to exceed the Purchase Price by an amount equal to not less than $250,000.00 as set forth in the Bidding Procedures Order.

"Purchaser" shall have the meaning set forth in the preamble hereof.

"Qualifying Bid" shall have the meaning set forth in Section 8.2(c)(v) hereof.

"Rehired Employees" shall have the meaning set forth in Section 12.1 hereof.

"Release" shall have the meaning set forth in CERCLA.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein.

"Sale Motion" shall have the meaning set forth in Section 6.6(a) hereof.

"Sale Order" means the Final Order of the Bankruptcy Court, in form reasonably acceptable to Purchaser and to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code

"Schedules" means the schedules attached hereto (including the Disclosure Schedules).

"Seller(s)" shall have the meanings set forth in the preamble hereof.

"Subsidiary" means, with respect to any Person, any corporation a majority of the total voting power of shares of stock of which is entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or any partnership, limited liability company, association or other business entity a majority of the partnership or other similar ownership interest of which is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, limited liability company, association or other business entity or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, real property, personal property, unclaimed property, environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Sellers, Purchaser or any of their respective Affiliates.

"Trademark Assignment" means the trademark assignment in form and substance reasonably satisfactory to Purchaser.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

Rules of Construction. Unless the context otherwise clearly indicates, in this Agreement:

(a)     the singular includes the plural;

(b)     "includes" and "including" are not limiting; and

(c)     "may not" is prohibitive and not permissive.

## ARTICLE II
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1     Purchase and Sale of Assets.

(a)     Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens, Claims, and other interests and encumbrances (whether arising prior to or subsequent to the petition for the Bankruptcy cases) (except for the Assumed Obligations and Permitted Liens), and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in Section 3.1, all properties, assets, rights, titles and interests of every kind and nature, owned, licensed or leased by Sellers (including indirect and other forms of beneficial ownership) as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, but not limited to, all of the following assets (all of the assets to be sold, assigned, transferred and delivered to Purchaser hereunder herein called the "Acquired Assets"; provided, that the Acquired Assets shall not include the Excluded Liabilities as set forth in Section 2.2 or the Excluded Assets retained by Sellers pursuant to Section 2.3):

(i)     all billed and unbilled accounts, notes and credit card receivables (whether current or noncurrent) and all causes of action specifically pertaining to the collection of the foregoing;

(ii)     all Intellectual Property, along with all goodwill associated therewith and the business symbolized thereby, all income, royalties, products, proceeds, damages and payments due or payable to Sellers as of the Closing or thereafter, including damages and payments for past, present or future infringements, misappropriations or other causes of actions thereof, the right to sue and recover for past infringements, misappropriations or other causes of actions thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property in Sellers' possession or control;

(iii)     all of Sellers' rights existing under the Assumed Executory Contracts (for the avoidance of doubt, a list of such Assumed Executory Contracts is set forth in Schedule 2.1(a)(iii)), as determined by Purchaser, to the extent that such Assumed Executory Contracts (A) have been entered into after the petition for the Bankruptcy cases, (B) have been

assumed prior to the date of this Agreement pursuant to an Order of the Bankruptcy Court, or (C) are assumed by Sellers and assigned to Purchaser pursuant to the Sale Order, or other order of the Bankruptcy Court;

(iv)    all safety deposit boxes, lock boxes and the like;

(v)    all owned machinery, equipment (including all transportation and office equipment), fixtures, trade fixtures, computer and information technology equipment and related data, telephone systems and furniture owned by Sellers wherever located, including all such items which are located in the Facility, provided, that, for the avoidance of doubt, the Acquired Assets shall not include Aptar Assets or the Huron Assets, and nothing in this Section 2.1(a) or elsewhere in this Agreement shall (i) affect or impair AptarGroup, Inc.'s ownership of the Aptar Assets or (i) affect or impair Huron's ownership of the Huron Assets;

(vi)    all Inventory;

(vii)    all owned office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever located, including all property of any kind located in any building, office or other space leased, owned or occupied by Sellers or in any warehouse where any of Sellers' properties and assets may be situated;

(viii)    all security deposits and advances and prepaid assets and other current assets including any Tax receivables and Tax refunds;

(ix)    all claims, including Claims, deposits, prepayments, warranties, guarantees, refunds, reimbursements, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent);

(x)    the right to receive and retain mail, accounts, notes and credit card receivables payments and other communications;

(xi)    the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(xii)    all Books and Records;

(xiii)    all advertising, marketing and promotional materials;

(xiv)    other than as set forth on Schedule 2.1(xiv), all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies;

(xv)    all goodwill as a going concern and all other intangible properties;

(xvi)    all telephone numbers;

(xvii) all of Sellers' rights to be indemnified, except for any indemnification rights under this Agreement;

(xviii) all rights to proceeds under insurance policies; and

(xix) all security deposits relating to Assumed Executory Contracts.

(b) Notwithstanding anything in this Agreement to the contrary, Purchaser may revise Schedule 2.1(a)(iii) to eliminate from, or add to, Schedule 2.1(a)(iii) any Lease or Contract, and exclude from or include in, as applicable, the definition of Assumed Executory Contracts such Lease or Contract by providing written notice to Sellers at any time prior to the Sale Hearing and Sellers shall use all reasonable efforts to obtain any necessary Bankruptcy Court approval for the assumption and assignment to Purchaser of such additional Assumed Executory Contracts, in accordance with Section 6.6.

2.2    Assignment and Assumption of Liabilities.

(a) Subject to the terms and conditions set forth in this Agreement, including Section 2.4 hereto, Purchaser shall only assume from Sellers and thereafter be responsible for the payment, performance or discharge of the Liabilities and obligations of Sellers under the Assumed Executory Contracts arising after the Closing (the "Assumed Obligations").

(b) Notwithstanding the foregoing provisions of Section 2.2(a), Purchaser may, in its sole discretion, elect to assume all or any portion of the Post-Petition Accounts Payable or Post-Petition Employee Compensation by providing written notice to Sellers at any time prior to the Closing, and any Post-Petition Accounts Payable or Post-Petition Employee Compensation that are so assumed shall become Assumed Obligations hereunder (such assumed portions of the Post-Petition Accounts Payable and Post-Petition Employee Compensation, collectively the "Assumed Post-Petition Obligations").  For the avoidance of doubt, (i) if Purchaser does not elect to assume any of the Post-Petition Accounts Payable or the Post-Petition Employee Compensation by providing such notice to Sellers, all Post-Petition Accounts Payable and Post-Petition Employee Compensation shall be Excluded Liabilities hereunder and shall be retained by Sellers, and (ii) if Purchaser elects to assume only a portion of the Post-Petition Accounts Payable or Post-Petition Employee Compensation, only the portions so assumed shall be Assumed Post-Petition Obligations and all other amounts of Post-Petition Accounts Payable or Post-Petition Employee Compensation shall be Excluded Liabilities and shall be retained by Sellers.

(c) Section 2.2(a) shall not limit any claims or defenses Purchaser may have against any party other than Sellers.  The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Purchaser or Sellers.