2.3    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Purchaser hereunder (all of the following are referred to collectively as the "Excluded Assets"):

(a)    any and all rights under this Agreement and avoidance claims or causes of action arising under the Bankruptcy Code or applicable state Law, including all rights and avoidance claims of Sellers arising under chapter 5 of the Bankruptcy Code;

(b)    all Contracts other than the Assumed Executory Contracts listed on Schedule 2.1(a)(iii) (taking into account any revisions to Schedule 2.1(a)(iii) made by Purchaser pursuant to Section 2.1(b)) (the "Excluded Contracts");

(c)    all cash (including checking account balances, certificates of deposit and other time deposits);

(d)    all rights to proceeds under any director and officer liability insurance policies of Sellers for claims arising prior to the Closing;

(e)    any asset set forth on Schedule 2.3(e);

(f)    all assets maintained pursuant to or in connection with any Employee Benefit Plan; and

(g)    any equity securities of any other issuer owned by either Seller and any notes receivable issued by any shareholder of either Seller in connection with the exercise of Sellers' stock options.

2.4    No Other Liabilities Assumed.  Sellers acknowledge and agree that pursuant to the terms and provisions of this Agreement, Purchaser will not assume, or in any way be liable or responsible for, any Liability of either Seller (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Acquired Assets (and the use thereof) or any outstanding checks), whether relating to or arising out of the Business, the Excluded Assets or the Acquired Assets or otherwise, other than the Assumed Obligations.  In furtherance and not in limitation of the foregoing, except as specifically set forth in Section 2.2, neither Purchaser nor any of its Affiliates shall assume, and shall not be deemed to have assumed, any Liability of any kind or nature whatsoever of Sellers resulting from, arising out of, relating to, in the nature of, or caused by (a) Indebtedness (other than Assumed Executory Contracts which are capitalized leases), (b) any Excluded Asset or Excluded Contract, (c) Taxes or escheat obligations of any kind or nature, (d) any Claim arising out of facts, events, circumstances, actions or inactions occurring on or prior to the Closing, (e) any Employee Benefit Plan, (f) any Excluded Environmental Liabilities, (g) any employees of Sellers who are not Rehired Employees, any former employees or any retirees of Sellers, or any dependents or beneficiaries thereof, (h) any breach of contract, breach of warranty, tort, infringement or other violation of the rights of another Person (including any Intellectual Property rights) or any lawsuits or violations of Law, (i) any other obligation of Sellers or any predecessor or Affiliate of Sellers whatsoever or any ERISA Affiliate other than the Assumed Obligations, or (j) any Post-Petition Accounts Payable or Post-Petition Employee Compensation (unless expressly

assumed by Purchaser pursuant to Section 2.2(b) (collectively, any such obligations, the "Excluded Liabilities").

2.5   <u>Deemed Consents</u>.  Sellers shall request that by providing notice of their intent to assume and assign any Contract or Lease, that the Bankruptcy Court deem the non-debtor party to such Contract or Lease to have consented to the sale if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, either Seller is authorized to assume and assign to Purchaser and Purchaser is authorized to accept such Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code.  For the avoidance of doubt, nothing contained in this <u>Section 2.5</u> shall affect or impair such non-debtor party's rights under 365(b) and (f) of the Bankruptcy Code, including their rights to cure and to adequate assurance of future performance.

2.6   <u>Obligations in Respect of Assumed Executory Contracts</u>.  Purchaser shall be responsible for paying all costs and expenses accrued subsequent to the Closing Date under any Assumed Executory Contract.  For the avoidance of doubt, except as set forth in 3.1(b), Purchaser shall not be responsible for any costs or expenses, including cure costs, incurred by either Seller with respect to any Contract, Lease and/or Assumed Executory Contract prior to the Closing Date.

### ARTICLE III
### BASIC TRANSACTION

3.1   <u>Payment of Purchase Price</u>.

(a)   In consideration of the sale, transfer, conveyance and assignment of the Acquired Assets to Purchaser at the Closing, Purchaser shall pay in cash to Sellers at the Closing $2,250,000 less (i) the amount of the Good Faith Deposit (as hereinafter defined) actually paid and (ii) the Property Tax Credit (the "<u>Purchase Price</u>"), payable by wire transfer of immediately available funds to that account or accounts designated in writing by Sellers in connection with the Closing.  Pursuant to the terms of the Bidding Procedures Order, within five (5) business days from the execution of this Agreement, Purchaser shall pay to Sellers by wire transfer One Hundred Twelve Thousand Five Hundred Dollars and no/100 ($112,500.00) (the "<u>Good Faith Deposit</u>").  The Good Faith Deposit shall be paid to Chicago Trust Company, pursuant to a joint order escrow between CDGI and Purchaser, and shall be held in trust in accordance with the terms of this Agreement and the Bidding Procedures Order.  At Closing, if any, the Good Faith Deposit shall be a credit against the Purchase Price and shall reduce the amount otherwise payable by Purchaser to Sellers at Closing.

(b)   In addition, Purchaser shall pay or reimburse to Sellers all cure amounts paid in accordance with <u>Section 6.6(b)</u>.

(c)   Payments made pursuant to this <u>Section 3.1</u> shall be allocated among the assets purchased in accordance with <u>Section 12.6</u>.

3.2   <u>Further Assurances</u>.  From time to time after the Closing, and without further consideration, (a) upon the request of Purchaser, each Seller shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as

contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (b) Purchaser, upon the request of Sellers, shall execute and deliver such documents and instruments of contract or lease assumption as Sellers may reasonably request in order to confirm Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

4.1     Sellers' Representations and Warranties.    Sellers represent and warrant to Purchaser to the best of the Knowledge of Sellers that the statements contained in this Article IV are correct and complete as of the Closing Date, except as expressly set forth in the schedules relating to this Article IV (the "Disclosure Schedules") and that all other Schedules are to the best of the Knowledge of the Sellers correct and complete as of the Closing Date, except as set forth in the Disclosure Schedules.    The information disclosed in any numbered part of the Disclosure Schedules shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered section in this Agreement and shall not be deemed to relate to or to qualify any other representation or warranty unless the applicability of such disclosure to such other representation or warranty is reasonably apparent on its face.    The mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself).

4.2     Validity of Agreement.    Subject to any necessary authorization from the Bankruptcy Court, Sellers have full power and authority to execute and deliver the Transaction Documents to which either of them is a party and to consummate the transactions contemplated hereby and thereby.    All Transaction Documents to which each Seller is a party has been duly executed and delivered by Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Sellers after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Sellers at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Sellers, enforceable against Sellers in accordance with their terms.

4.3     Organization, Standing and Power.  Each Seller is duly organized, validly existing and in good standing under the Laws of the State of Illinois and is qualified to do business in every jurisdiction in which it is required to be qualified.  Subject to any necessary authorization from the Bankruptcy Court, Sellers have all requisite corporate power and authority to own, lease and operate their properties, to carry on the Business as now being conducted, to execute and deliver the Transaction Documents, subject to Bankruptcy Court authorization and to perform their obligations thereunder.

4.4     Intentionally omitted.

4.5     No Consents.  No consent, approval or action of, filing with or notice to any Governmental Authority is required to be obtained by a Seller in connection with the execution,

delivery and performance of this Agreement or any of the Transaction Documents, or the consummation of the transactions contemplated hereby or thereby, except (a) for consents, approvals or actions of and filings with or notice to the Bankruptcy Court, (b) the consents, approvals or notices set forth in Schedule 4.5 and (c) where the failure to obtain any such consent, approval or action, to make any such filing or to give any such notice would not materially and adversely affect the ability of a Seller to consummate the transactions contemplated by this Agreement or any of the Transaction Documents or to perform its obligations hereunder or thereunder or have a Material Adverse Effect on the condition of the Business.

4.6     Intentionally omitted.

4.7     Intentionally omitted.

4.8     Title to Property.  Subject to receipt of the approval of the Bankruptcy Court pursuant to the Sale Order, Sellers have, or at the Closing will have, the right to deliver to Purchaser good and marketable title to, or a valid leasehold interest in, all of the Acquired Assets free and clear of all liens, claims and interests.

4.9     Brokers.  Except as set forth on Schedule 4.9, neither Seller has incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

4.10     Intellectual Property.  Except as set forth on Schedule 4.10, (a) one or the other of Sellers owns and possesses all right, title and interest in and to (or has the right to use pursuant to a license or other permission) the Intellectual Property; (b) neither Seller has any obligation to compensate any Person for the right to use any of the Intellectual Property (except, in the case of Intellectual Property that is licensed, for obligations pursuant to the applicable license agreement); (c) neither Seller has granted to any Person any license, option or other similar rights in or to any of the Intellectual Property; (d) neither Seller has received any written notice from any Person that challenges the validity or enforceability of any of the Intellectual Property; (e) neither Seller has received any notice from any Person challenging a Seller's ownership of, or right to use, any of the Intellectual Property; and (f) to the Knowledge of each Seller, no Person is infringing upon or has misappropriated any of the Intellectual Property.

4.11     Limitations.  Except as expressly provided herein or in the Sale Order approving this Agreement, Purchaser agrees and acknowledges that all transfers of the Acquired Assets are "as is" and "where is", and acknowledges and agrees that Sellers make no representation of any kind whatsoever with respect to the Acquired Assets or otherwise, express or implied, including but not limited to any representation or warranty regarding the condition of the Acquired Assets, or the fitness, desirability, or the merchantability thereof or suitability thereof for any particular purpose, assessment or valuation of any of the Acquired Assets, or the actual projected income or operating expense of the business or Acquired Assets.  Purchaser further acknowledges and represents that it has reviewed and inspected the Acquired Assets, has had the opportunity to inspect the books and records of Sellers and the public filing records, and enters into this Agreement after independent investigation of the facts and circumstances relating to the Acquired Assets, the operations of the business and the transactions described herein.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

5.1    Organization. Purchaser is validly existing and in good standing under the Laws of the State of Illinois and has the full power and authority to execute, deliver and perform this Agreement and to consummate all transactions contemplated hereby.

5.2    Authority.   The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Purchaser and do not and will not violate any provisions of its organizational documents, any applicable Law or any agreement or instrument by which it is bound or Order binding upon it.  This Agreement constitutes a valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

5.3    No Conflicts or Violations.   The execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not (a) conflict with or result in any breach of any of the terms, conditions or provisions of, (b) constitute a default under, (c) result in a violation of, (d) give any Third Party the right to modify, terminate or accelerate any obligation under, or (e) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, under any agreement or instrument to which Purchaser is bound or affected, or any Law to which Purchaser is subject or any Order to which Purchaser is subject.

5.4    Brokers. Purchaser has incurred no Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

5.5    Confidentiality .  In the event the transactions contemplated hereby are not consummated for any reason, without limiting the other rights and/or remedies of the parties, Purchaser shall promptly return to Sellers, or destroy, all documents and other materials and all copies of the foregoing that were furnished to Purchaser to date in connection with its due diligence investigation of Sellers, its assets or Sellers' business, as provided therein.

5.6    Investigation. Purchaser has or will make its own investigation concerning the physical condition of the Acquired Assets and the business, the condition of title or any other matter pertaining to the Acquired Assets; and, other than the specific representations made by Sellers pursuant to this Agreement, Purchaser is not relying on any representations, warranties or inducements of Sellers (or any agent of Sellers) with respect to the physical condition of the Acquired Assets.

5.7    No Other Representations or Warranties.  Except for the representations and warranties and covenants contained in this Agreement, Purchaser makes no other express or implied representation or warranty with respect to the transactions contemplated hereby, and

Purchaser disclaims any other representations or warranties, whether made by it or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE VI
## COVENANTS OF SELLERS; OTHER AGREEMENTS

6.1    Consents and Approvals.

(a)    Sellers and Purchaser shall, at Purchaser's cost and expense, use commercially reasonable efforts (i) to obtain all necessary consents and approvals, as reasonably requested by Purchaser, to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including obtaining the Bidding Procedures Order and Sale Order, (ii) to make, as reasonably requested by Purchaser, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby and (iii) to obtain, as requested by Purchaser, all required consents and approvals (if any) necessary to assign and transfer Sellers' Permits to Purchaser at Closing and, to the extent that one or more of Sellers' Permits are not transferable, to assist Purchaser in obtaining replacements therefor.  In the event that certain of Sellers' Permits, or any Contract or other license or agreement necessary for the operation of the Business as presently conducted are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits, Contracts or other licenses or agreements are obtainable after the Closing, Sellers shall continue to use such commercially reasonable efforts in cooperation with Purchaser after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits, Contracts or other licenses or agreements after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits, Contracts or other licenses or agreements, in each case at Sellers' sole cost and expense.

(b)    Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement.

6.2    Access to Information and Facility.  Sellers agree that, prior to the Closing Date, Purchaser and its representatives (including its accountants, advisors, consultants and legal counsel) shall, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Sellers, have reasonable access during normal business hours to the Facility and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Sellers (including any environmental audits and investigations or to conduct a physical inventory of the Inventory) and such examination of the Books and Records and financial condition of Sellers as it reasonably requests and to make extracts and copies to the extent necessary of the Books and Records.

6.3    Conduct of the Business Pending the Closing.  Except as otherwise expressly contemplated by this Agreement and due to effects arising from the filing of the Bankruptcy Case, from the date hereof until the Closing Date, Sellers shall: (a) conduct the Business in the

Ordinary Course of Business; (b) use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current employees and agents and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations; (c) maintain and operate the Acquired Assets in the Ordinary Course of Business and repair and continue normal maintenance, normal wear and tear expected; (d) continue to operate the Business in all material respects in compliance with all Laws applicable to Sellers or the Business; (e) continue to (i) conduct the Business, (ii) operate the billing and collection policies and procedures with respect to the Business, (iii) maintain the books and records of the Business in the Ordinary Course of Business (iv) maintain the employees of Sellers as set forth on Schedule 6.3; (f) promptly advise Purchaser in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect; (g) not sell, lease transfer, mortgage, encumber, alienate or dispose of the Acquired Assets; (h) not institute new methods of accounting that will vary materially from the methods used by Sellers as of the date of this Agreement except as may be required by GAAP; (i) not enter into any Contract or purchase order not in the Ordinary Course of Business; and (j) not take any action inconsistent with this Agreement or with the consummation of the Closing.

6.4     Notification of Certain Matters.

(a)     Sellers shall give notice to Purchaser, within two (2) business days of the Knowledge of Sellers of the occurrence of the event giving rise to a notice obligation pursuant to this Section 6.4 (a), but no later than the time of Closing, of (i) the occurrence or nonoccurrence of any event that causes, directly or indirectly, any Material Adverse Effect on Sellers, or (ii) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder.  Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 6.4(a) shall not (x) be deemed to amend or supplement any of the Disclosure Schedules, (y) be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(b)     Sellers shall add Purchaser, and Purchaser's counsel, to Sellers' so-called "Rule 2002 notice list" and otherwise provide notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and Rules.

6.5     Further Assurances.  Purchaser and Sellers shall execute all documents and take all actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby.  Purchaser and Sellers shall use their commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VIII and Article IX, respectively, of this Agreement.

6.6     Bankruptcy Actions.

(a)     As soon as practicable following the determination of Purchaser as the Highest or Best Bid, either pursuant to an Auction or otherwise, Sellers shall seek Bankruptcy Court approval of; (i) the transaction contemplated hereby, (ii) this Agreement, (iii) Sellers' performance under this Agreement, and (iv) the assumption and the assignment of the Assumed Executory Contracts, pursuant to section 365 of the Bankruptcy Code.  Purchaser shall take such

actions as are reasonably requested by Sellers to assist Sellers in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Acquired Assets in good faith pursuant to section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Assumed Executory Contracts as required by section 365 of the Bankruptcy Code.

(b)    A list of the Assumed Executory Contracts (as set forth on Schedule 2.1(a)(iii)) shall be filed as an exhibit to any motion to assume and assign the Assumed Executory Contracts as a part of the sale process, and otherwise shall be described in sufficient detail to provide adequate notice to the non-debtor party to such contracts.  Upon revision of Schedule 2.1(a)(iii) by Purchaser pursuant to Section 2.1(b), Sellers shall add any Assumed Executory Contracts to the exhibit or remove Assumed Executory Contracts from the exhibit, as applicable.  Such exhibit, as may be amended pursuant to Section 2.1(b), shall set forth the amounts necessary to cure defaults under each of such Assumed Executory Contracts as determined by Sellers based on the Books and Records.  In cases in which Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00.  Any and all cure amounts must be paid within three (3) business days of entry of the Sale Order.  In the event of any dispute with respect to cure requirements or adequate assurance of future performance that cannot be resolved by the relevant parties, such dispute shall be resolved by the Bankruptcy Court.  Sellers shall provide Purchaser with the current cure amounts (as of the date hereof) for each of the Assumed Executory Contracts (the "Current Cure Amounts") within five (5) business days from the date hereof, and within three (3) business days from the addition of any Contract or Lease to Schedule 2.1(a)(iii) pursuant to Section 2.1(b).

(c)    Sellers will provide Purchaser with a reasonable opportunity to review and comment upon the proposed form of the Bidding Procedures Order and the Sale Order.

6.7    Stalking Horse; Solicitation of Transactions.

(a)    Purchaser and Sellers acknowledge that under the Bankruptcy Code, the sale of Acquired Assets is subject to approval of the Bankruptcy Court.  Purchaser and Sellers acknowledge that to obtain such approval, each Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Acquired Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Acquired Assets to responsible bidders, entertaining higher or better offers from responsible bidders and, if necessary, conducting an Auction.

(b)    Each Seller represents that, other than the transactions contemplated by this Agreement, neither Seller is a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any material part of the Business or the Acquired Assets.

(c)    Sellers acknowledge they have solicited other potential bids for the sale of the Business through the date of this Agreement.  Pursuant to such efforts, and as consideration for substantial expenditures of time, effort and expense undertaken and continuing by Purchaser in connection with the completion of its due diligence review of the business and the preparation,

negotiation, and execution of this Agreement, Sellers acknowledge and agree that (i) Purchaser shall be the stalking horse bidder at the Auction, (ii) no Person other than Purchaser shall be the stalking horse bidder at the Auction and Sellers shall not participate in any negotiations for the purpose of naming any Person other than Purchaser as the stalking horse bidder in the Auction, (iii) Sellers shall actively oppose any effort by any other Person to be the stalking horse bidder and (iv) shall notify Purchaser of any efforts by others of which Sellers have Knowledge; provided that consistent with each Seller's fiduciary duties to elicit the highest and best offer for the Acquired Assets and to conduct the Auction, Sellers may solicit, encourage and negotiate higher or better offers for the Acquired Assets under the terms of the Bidding Procedures Order, and provided further that Sellers may, in response to an acquisition proposal for some or all of the Acquired Assets pursuant to the Bidding Procedures Order, participate in negotiations or discussions with, request clarifications from, or furnish information to, any person that makes such acquisition proposal.

6.8     Confidentiality; Non-Disclosure.    Sellers acknowledge and agree that any materials developed by Purchaser or any of its representatives (including its accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel) are the property of Purchaser and are confidential, shall be maintained as confidential by Sellers and shall not be disclosed to any other Person.  In the event Sellers are required by Law to disclose any such confidential information, Sellers shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with Purchaser to obtain a protection order and otherwise preserve the confidentiality of such information consistent with applicable Law. Information subject to the confidentiality obligations in this Section 6.8 does not include any information which (x) at the time of disclosure is generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement) or (y) becomes available on a non-confidential basis from a Person who is not bound by a confidentiality agreement with Purchaser or its Affiliates or who is not otherwise prohibited from transmitting the information

6.9     Other Bids.    Purchaser acknowledges that pursuant to the Bidding Procedures Order, both before and after entry of the Bidding Procedures Order on the Bankruptcy Court's docket, Sellers will solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of some, all or substantially all of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement (or improved terms) and in accordance with the procedures set forth in the Bidding Procedures Order.

6.10    Excluded Assets and Liabilities.    Subsequent to the Closing, Sellers agrees to indemnify, defend, protect, and save and hold Purchaser harmless with respect to the Excluded Assets and Excluded Liabilities.  Sellers' obligations under this section shall be an administrative expense priority obligation under section 507(a)(2) of the Bankruptcy Code.

6.11    Intentionally omitted.

6.12    Taxes.

(a)     On or prior to the Closing (or after the Closing when due and payable, to the extent such Taxes are due and payable after the Closing), to the extent required under the

Bankruptcy Code or by Laws, Sellers shall pay all sales taxes, use taxes, payroll taxes, and Taxes which will be owed by Sellers and attributable to periods prior to the Closing.

(b) Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges due and which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid as follows: (i) fifty (50%) percent by Purchaser and (ii) fifty (50%) percent by Sellers. Sellers shall prepare and timely file all Tax Returns required to be filed in connection with such payments.

## ARTICLE VII
## COVENANTS OF PURCHASER

7.1     Assumed Obligations.     Subsequent to the Closing, Purchaser agrees to be responsible for the payment and performance of the Assumed Obligations and shall indemnify, defend, protect, and save and hold Sellers harmless with respect to the Assumed Obligations in accordance with Section 12.3.

7.2     Operation.  Purchaser shall be obligated to discharge, pay, perform and satisfy all of the duties, liabilities and obligations arising, from and after the Closing, from the ownership, maintenance, operation, use, development, sale or leasing of, or other operation of the Business with respect to the Acquired Assets and the Assumed Executory Contracts.

7.3     Further Assurances.  Purchaser shall execute such documents and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby.  Purchaser shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article IX of this Agreement.

7.4     Post-Petition Financing   Upon its designation as the stalking horse bidder, Purchaser agrees to provide post-petition financing to Sellers in the amount of up to $300,000. In the event the Sellers request the same, the provision of any such post-petition financing shall be accomplished via motion submitted to the Bankruptcy Court, and notice to all relevant parties in interest, as required under the Bankruptcy Code.

7.5     Confidentiality; Non-Disclosure.  Purchaser acknowledges and agrees that any, until Closing, materials developed by Sellers or any of their representatives (including their accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel) are the property of Sellers and are confidential, shall be maintained as confidential by Purchaser and shall not be disclosed to any other Person, other than Purchaser's representatives (including its accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel).  In the event Purchaser is required by Law to disclose any such confidential information, Purchaser shall promptly notify Sellers in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with Sellers to obtain a protection order and otherwise preserve the confidentiality of such information consistent with applicable Law.  Information subject to the confidentiality obligations in this Section 7.5 does not include any information which (x) at the time of disclosure is generally available to or known by the public (other than as a result of

its disclosure in breach of this Agreement) or (y) becomes available on a non-confidential basis from a Person who is not bound by a confidentiality agreement with Sellers or their Affiliates or who is not otherwise prohibited from transmitting the information. This Section 7.5 shall expire at Closing, or termination of this Agreement.

<h1 style="text-align:center">ARTICLE VIII<br>CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER</h1>

The obligations of Purchaser under this Agreement are, at the sole and exclusive option of Purchaser, subject to satisfaction of the following conditions precedent on or before the Closing Date.

8.1    <u>Warranties True as of Both Present Date and Closing Date; Covenants</u>.

(a)    All of the representations and warranties of Sellers shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

(b)    Sellers shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

8.2    <u>Bankruptcy Condition</u>.

(a)    The Bidding Procedures Order and Sale Order shall have been signed by a judge of the Bankruptcy Court and shall be Final Orders.

(b)    The Sale Order shall (i) approve and authorize the assumption and assignment of the Assumed Executory Contracts, and the Assumed Executory Contracts shall have been actually assumed by and assigned to Purchaser such that the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims of (including, without limitation, cure claims under section 365 of the Bankruptcy Code, except as otherwise specifically provided in the Sale Order) existing as of the Closing or by reason of the Closing, and (ii) shall provide that the Acquired Assets are being sold free and clear of any interest in the Acquired Assets, pursuant to Section 363(f) of the Bankruptcy Code.

(c)    The Bidding Procedures Order shall provide, among other things, that:

(i)    in the event Purchaser is not deemed to be the Successful Bidder (as defined in the Bidding Procedures Order), and does not become the Successful Bidder after originally being designated as the Back-Up Bidder (as defined in the Bidding Procedures Order), Sellers shall (x) pay (in cash) to Purchaser a breakup fee equal to $100,000.00 (the "<u>Breakup Fee</u>") immediately upon such proceeds being received by Sellers;

(ii)    Sellers are authorized without further Bankruptcy Court action to pay any amounts that become due and payable to Purchaser pursuant to this Agreement (including, without limitation, the Breakup Fee) and that pursuant to section 507(a)(2) of the

Bankruptcy Code, Purchaser shall have an allowed administrative expense priority claim for such amounts;

(iii)    no party other than Purchaser submitting any offer to purchase the Acquired Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup, or termination or similar fee or payment;

(iv)    as part of any Bid, each Bidder shall submit a copy of this Agreement marked to show changes, along with any other bid package requirements to Sellers and Purchaser, and place into escrow a cash deposit of no less than 5% of the purchase price set forth in the Bid;

(v)    (A) a Bid will not be considered by Sellers as qualified for the Auction unless such Bid is for more than an amount equal to the sum of (I) Purchase Price; and (II) the dollar value of the Purchase Price Protection; (B) if there is a Bid that satisfies clause (A), then any Bids thereafter must exceed the then existing highest Bid by an increment of not less than $50,000 in cash; provided, however, any overbid Bids by Purchaser thereafter shall only be required to be equal to the sum of: (I) the then existing lead Bid plus (II) $50,000 less (III) the dollar value of the Breakup Fee; and (C) a higher Bid will not be considered by Sellers as qualified for the Auction if: (I) such Bid contains financing or due diligence contingencies of any kind; (II) such Bid is not received by Sellers and Purchaser in writing on or prior to the third (3rd) day prior to the Auction; or (IV) such Bid does not identify the actual Bidders and owners of the Bidder and contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale on or before the Closing Date, including proof of deposit into escrow of no less than 5% of the purchase price (each Bid which meets the foregoing criteria constitutes, as applicable, a "Qualifying Bid");

(vi)    if one or more Qualifying Bids are submitted in accordance with the Bidding Procedures Order, Sellers will conduct the Auction as set forth in this Agreement. At the Auction, Sellers shall have the right to select the highest or best Bid from Purchaser and any Person who submitted a Qualifying Bid pursuant to Section 8.2(c)(v) (the "Highest or Best Bid"), which will be determined by considering, among other things: (A) the number, type, and nature of any changes to this Agreement requested by each Bidder; (B) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to Sellers of such modifications or delay; (C) the total consideration to be received by Sellers; (D) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (E) the net benefit to the estate, taking into account Purchaser's rights to the Breakup Fee;

(vii)    at the Auction, Purchaser shall have the right to: (A) submit further Bids along with a markup of this Agreement and (B) at anytime, request that Sellers announce, subject to any potential new Bids, the then current Highest or Best Bid and, to the extent Purchaser requests, use reasonable efforts to clarify any and all questions Purchaser may have regarding Sellers' announcement of the then current Highest or Best Bid;

(viii)    Sellers shall not contest any argument by Purchaser that it has standing to contest the Highest or Best Bid selected by Sellers;

(d)    Notwithstanding Sections 8.2(a) and 10.1, nothing in this Agreement shall preclude Purchaser or Sellers from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders.  No notice of such waiver of this or any other condition to Closing need be given except to Sellers' pre-petition and post-petition lenders, and the United States Trustee, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of Law if the Closing occurs in the absence of Final Orders;

(e)    Sellers shall have timely provided Purchaser with the Current Cure Amounts pursuant to Section 6.6(b);

(f)    The final cure amounts approved via the Sale Order (including any disputed cure amounts determined by the Bankruptcy Court), which the Purchaser is required to pay under this Agreement, shall be no greater than 103% of the Current Cure Amounts.

8.3    Material Adverse Change.  There shall not have occurred a Material Adverse Change since the date of this Agreement.

8.4    Litigation.  No order shall have been entered that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

8.5    Approvals.  All authorizations, consents, filings and approvals necessary to permit Sellers to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.  All terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

8.6    Closing Certificate.  Sellers shall have delivered to Purchaser a certificate signed by Sellers, dated the date of the Closing Date (in form and substance reasonably satisfactory to Purchaser), certifying that the conditions specified in Sections 8.1 and Section 8.3 have been satisfied as of the Closing.

8.7    Post-Petition Obligations.  Sellers shall have fully satisfied all Post-Petition Accounts Payable and Post-Petition Employee Compensation, except for those Post-Petition Obligations assumed by Purchaser pursuant to section 2.2(b).

8.8    Financing.  No later than one week prior to the date scheduled for the Auction, Purchaser shall have been able to obtain a commitment for financing, sufficient to consummate the sale contemplated by this Agreement.

8.9    Due Diligence.  No later than one week prior to the date scheduled for the Auction, (1) Sellers shall have delivered (to Purchaser and all prospective bidders) updated Schedules, including Disclosure Schedules, or a certificate of Sellers dated as of a date no earlier than one week prior to the date scheduled for the Auction, that such Schedules are true and correct as of that date and (2) Purchaser, after receipt of such updated Schedules or certificate,

shall indicate to Sellers in writing that Purchaser is satisfied, in its sole discretion that it desires to complete and close the acquisition of assets contemplated by this Agreement. If at any time after entering into this Agreement, Purchaser becomes aware of or is advised of any information that results in Purchaser, in its sole discretion, electing not to pursue the acquisition of assets from Sellers contemplated by this Agreement, Purchaser shall notify Sellers of that determination in writing and Purchaser's obligations to Sellers hereunder shall thereafter be terminated.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers under this Agreement are, at the option of Sellers, subject to the satisfaction of the following conditions precedent on or before the Closing Date.

9.1    Warranties True as of Both Present Date and Closing Date.  The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made by Purchaser on and as of the Closing Date.  Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

9.2    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered an order approving of the execution of this Agreement by Sellers and of the consummation by Sellers of the transactions contemplated hereby that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

9.3    Litigation.  No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or involving a claim that consummation thereof would result in the violation of any Law.

9.4    Approvals.  All authorizations, consents, filings and approvals necessary to permit Purchaser to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Sellers, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.  All terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

9.5    Closing Deliveries.  Purchaser shall have delivered to Sellers such amounts as are necessary that Sellers shall collectively have received from Purchaser since the execution of this Agreement the Purchase Price in readily available Dollars.  In addition, Sellers shall have received from Purchaser a certificate signed by Purchaser, dated the date of the Closing (in form and substance reasonably satisfactory to Sellers) certifying that the conditions specified in Section 9.1 above have been satisfied as of the Closing or shall have been waived.

## ARTICLE X
## CLOSING

10.1    <u>Closing</u>.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Pedersen & Houpt, 161 N. Clark, Suite 3100, Chicago, IL 60601 at 10:00 A.M. Central Time no later than the first business day after the date on which the conditions set forth in <u>Article VIII</u> and <u>Article IX</u> have been satisfied or waived, or on such other date or place as Purchaser and Sellers may determine (the "<u>Closing Date</u>").

10.2    <u>Deliveries by Sellers</u>.    At the Closing, Sellers shall deliver or procure delivery to Purchaser of:

(a)    a quitclaim deed, in form and substance reasonably satisfactory to Purchaser, conveying in the aggregate all of the owned real property of Sellers included in the Acquired Assets, duly executed by Sellers;

(b)    a quitclaim assignment of leases, in form and substance reasonably satisfactory to Purchaser, duly executed by Sellers;

(c)    a title insurance policy, in form and substance reasonably satisfactory to Purchaser, containing insuring provisions, requirements and exceptions to coverage approved by Purchaser;

(d)    one or more bills of sale, in form and substance reasonably satisfactory to Purchaser, conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets, duly executed by Sellers;

(e)    to the extent necessary to duly assign such rights to Purchaser, one or more assignments and assumptions of the Assumed Obligations, in form and substance reasonably satisfactory to Purchaser (collectively, the "<u>Assignment and Assumption</u>"), duly executed by Sellers;

(f)    duly executed Intellectual Property Assignments, in form and substance reasonably satisfactory to Purchaser, each in recordable form to the extent (i) necessary to duly assign such rights to Purchaser and (ii) allowed under the Bankruptcy Code and applicable Law;

(g)    an affidavit from Sellers, dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code certifying under penalties of perjury that neither Sellers is a foreign person pursuant to section 1445(b)(2) of the Code;

(h)    certificates of title and title transfer documents to all titled motor vehicles;

(i)    to the extent necessary to duly assign such rights to Purchaser, an assignment and assumption agreement with respect to each Seller's Permits and warranties in form and substance reasonably acceptable to Purchaser, whereby Sellers shall assign to Purchaser all of their respective rights in and to any Permits and warranties relating (directly or

indirectly) to the Acquired Assets or the Business, to the extent such Permits and warranties are assignable;

(j)    all the Books and Records, and any data related to the Business;

(k)    such other instruments, in form and substance, reasonably satisfactory to Purchaser, as are necessary to vest in Purchaser good and marketable title in and to the Acquired Assets in accordance with the provisions hereof;

(l)    such documentation as may be necessary to change the authorized signatories on any bank accounts to be transferred hereby or powers of attorney relating (directly or indirectly) to the Acquired Assets or the Business;

(m)    a certified copy of the Sale Order;

(n)    anything other information or materials reasonably necessary tor Purchaser to operate the Business following the Closing in a manner that is consistent with the way Sellers have conducted the business historically; and

(o)    any other deliveries specified in Article VIII.

10.3    Deliveries by Purchaser. At the Closing, Purchaser will deliver (a) to Sellers (i) the Assignment and Assumption duly executed by Purchaser, (ii) shall pay by wire transfer an amount equal to the Purchase Price and (iii) any other deliveries of Purchaser specified in Article VIII.

10.4    Form of Instruments. To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Sellers.

**ARTICLE XI
TERMINATION; TERMINATION PAYMENT**

11.1    Termination. This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and Sellers;

(b)    by either Purchaser or Sellers if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)    by either Purchaser or Sellers (provided that Purchaser, if it is the terminating party, or either Seller if one of them is the terminating party, is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or obligations set forth in this Agreement on the part of either Seller, on the one hand, or Purchaser on the other hand, which breach would give rise to

the failure of the conditions set forth in Section 8.1 or 9.1, as applicable, and such breach is not cured within ten days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d)    by Purchaser or Sellers (provided that Purchaser, if it is the terminating party, or either Seller if one of them is the terminating party, is not in material breach of any representation, warranty, covenant or other agreement contained herein) if a material condition set forth in Article VIII or Article IV for the benefit of Purchaser, if it is the terminating party, or either Seller if one of them is the terminating party, has not been or cannot be fulfilled or satisfied prior to the Termination Date and has not been waived by Purchaser, if it is the terminating party, or either Seller if one of them is the terminating party; provided that Purchaser, if it is the terminating party, or either Seller if one of them is the terminating party, shall not be responsible for the failure of such condition to be satisfied;

(e)    by Purchaser, if either Seller seeks or supports Bankruptcy Court approval of an Alternative Transaction or a chapter 11 plan contemplating the sale or retention of the Acquired Assets in any manner inconsistent with the terms of this Agreement;

(f)    by Purchaser, in the event Purchaser is not deemed to be the Successful Bidder, and does not become the Successful Bidder after originally being designated as the Back-Up Bidder, or if the Bankruptcy Court enters an order approving any Alternative Transaction;

(g)    by Purchaser or Sellers on any day on or after December 15, 2013 (the "Termination Date") if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing), unless the Closing has not occurred due to a material failure of the terminating party to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date;

(h)    by Purchaser, if the Bankruptcy Court confirms a plan of reorganization for Sellers that is inconsistent with the transactions contemplated by this Agreement;

(i)    by Purchaser, if the conditions set forth in either of Section 8.8 or 8.9 has not been satisfied in Purchaser's sole discretion;

(j)    by Purchaser, if a trustee is appointed pursuant to Section 1104 of the Bankruptcy Code, in either of the Bankruptcy Cases; or

(k)    by Purchaser, if either of the Bankruptcy Cases is dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

11.2    Breakup Fee; Refund of Good Faith Deposit.

(a)    Upon the first to occur of a termination pursuant to (i) Section 11.1(e), (ii) Section 11.1(f) or (iii) Section 11.1(h), Sellers shall pay (in cash) to Purchaser the Breakup Fee out of the proceeds of the Alternative Transaction, immediately upon such proceeds being received by Sellers. The Purchaser may seek, via motion submitted to the Bankruptcy Court, and

notice to all relevant parties in interest, as required under the Bankruptcy Code, an order providing that, in the event there are no proceeds from such Alternative Transaction to pay the Breakup Fee, the Breakup Fee shall constitute a super-priority administrative obligation of Sellers under section 364(c)(1) of the Bankruptcy Code.

(b)     Sellers' obligation to pay the Breakup Fee pursuant to this Section 11.2 shall survive termination of this Agreement.

(c)     The Good Faith Deposit shall be fully refundable to Purchaser in accordance with the bidding procedures approved by the Bidding Procedures Order; provided, however, that if the Purchaser is deemed the Successful Bidder, or becomes the Successful Bidder after being originally designated as the Backup Bidder (as such term is defind in the Bidding Procedures Order), but can't consummate the transactions contemplated hereby due to Purchaser's breach of a representation, warranty, covenant or other agreement contained herein, which breach cannot be cured within five (5) business days from written notice by Sellers to Purchaser of any such breach, Sellers shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by Purchaser.

11.3     Effect of Termination or Breach.  If the transactions contemplated hereby are not consummated (a) this Agreement shall become null and void and of no further force and effect, except (i) for this Section 11.3 and (ii) for the provisions of Sections 3.1(b), 6.8, 11.2, 13.1, 13.2, 13.4, 13.7, 13.8, 13.9, 13.10, and 13.11 hereof, each of provisions set forth in (i) and (ii) above to survive the termination of this Agreement; (b) the receipt by Purchaser of the Breakup Fee, which shall be payable in accordance with Section 11.2, shall be Purchaser's sole and exclusive remedy (as liquidated damages) other than for claims based on actual fraud, and Purchaser shall not be entitled to any other damages, losses, or payment from Sellers, and Sellers shall have no further obligation of Liability of any kind to Purchaser or its Affiliates on account of this Agreement; and (c) if this Agreement is terminated for any reason other than the termination of this Agreement by Sellers pursuant to Section 11.1(c), Sellers shall not be entitled to any damages, losses, or payment from Purchaser, and Purchaser shall have no further obligation or Liability of any kind to Sellers or any of its Affiliates on account of this Agreement.

**ARTICLE XII**
**ADDITIONAL POST-CLOSING COVENANTS**

12.1     Employees.

(a)     Purchaser shall offer employment immediately prior to the Closing (but contingent on the occurrence of the Closing) to such employees of Sellers actively employed or engaged principally in the Business as of the Closing Date as determined by Purchaser in its sole discretion (such employees who accept such offer of employment, the "Rehired Employees") on terms and conditions as determined by Purchaser in its sole discretion.

(b)     Nothing contained in this Agreement shall confer upon any Rehired Employee any right with respect to continuance of employment by Purchaser or any of its Affiliates, nor shall anything herein interfere with the right of Purchaser or any of its Affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with

or without notice and for any or no reason, or restrict Purchaser or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after the Closing.

12.2   Joint Post-Closing Covenants of Purchaser and Sellers.   Purchaser and Sellers jointly covenant and agree that, from and after the Closing Date, Purchaser and Sellers will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of an audit of any Tax Return of Sellers or Purchaser for all periods prior to or including the Closing Date and (b) any audit of Purchaser and/or any audit of Sellers with respect to the sales, transfer and similar Taxes imposed by the Laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement.   In furtherance hereof, Purchaser and Sellers further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.   All costs and expenses incurred in connection with this Section 12.2 referred to herein shall be borne by the party who is subject to such action.

12.3   Certain Consents.   If a consent of a Third Party which is required in order to assign any Acquired Asset (or Claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of Sellers to convey its interest in question to Purchaser, Sellers will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interests of Sellers in the benefits of such Acquired Asset.   If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, Sellers agree to continue to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date.

12.4   Post Closing Operating of Sellers; Name Changes.   Provided Purchaser is approved as the succesful bidder at the Auction, from and after the Closing, Sellers will cease their operations and will not engage in any competive business whatsoever, except for matters required by the Bankruptcy Court, including collecting receivables, selling Excluded Assets, notifying customers and suppliers that Sellers are going out of business, minor ministerial matters not related to the Business or enforcing their rights and performing their obligations under this Agreement.

12.5   Accounts Receivable; Collections.   After the Closing, Sellers shall permit, and hereby authorize, Purchaser to collect, in the name of Sellers, all accounts, notes and credit card receivables constituting part of the Acquired Assets and to endorse with the name of Sellers for deposit in Purchaser's account any checks or drafts received in payment thereof.   Sellers shall promptly deliver to Purchaser any cash, checks or other property that Sellers may receive after the Closing in respect of any accounts, notes and credit card receivables or other asset constituting part of the Acquired Assets.

12.6   Tax Matters.   Purchaser shall, within 120 days after the Closing Date, prepare and deliver to Sellers a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the Acquired

Assets in accordance with the requirements of Section 1060 of the Code and the regulations thereunder (such schedule, the "Allocation"), and Sellers and Libertyville Bank and Trust Company shall have 10 days to review and provide comments to such schedule; provided, however, that the Allocation shall be used solely for tax purposes, and shall not affect the rights of any parties in interest, including, Libertyville Bank and Trust Company and Pinnacle Services, Inc., to argue that the Purchase Price should be otherwise allocated in the Bankruptcy Cases. Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Authority or any other proceeding). Purchaser and Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 12.6 shall survive the Closing without limitation.

## ARTICLE XIII
## MISCELLANEOUS

13.1    Survival. The representations and warranties contained in this Agreement shall not survive the Closing. Each of the covenants and obligations of Purchaser and Sellers in this Agreement and in the other Transaction Documents shall survive in accordance with their respective terms.

13.2    Expenses.

(a)    Except as provided in Section 8.2(c) or 11.2 hereof, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

13.3    Amendment. This Agreement may not be amended, modified or supplemented except by a written instrument signed by Sellers and Purchaser.

13.4    Notices. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, email or other wire transmission (with answer back confirmation of such transmission, and, if sent by email, provided that a copy of such notice, request or instruction or other document be sent by overnight delivery), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

To Sellers:          Jack Pressman
                     1331 East Business Center Drive
                     Mount Prospect, Illinois  60056

with a copy (which shall not constitute notice) to:

                     Ariel Weissberg
                     Weissberg and Associates, Ltd.
                     401 South LaSalle Street, Suite 403
                     Chicago, Illinois  60605
                     Facsimile: (312) 663-1514

To Purchaser, to:    Mark Radzik
                     222 West Adams Street, Suite 1980
                     Chicago, Illinois  60606

with a copy (which shall not constitute notice) to:

                     Pedersen & Houpt
                     161 North Clark Street, Suite 3100
                     Chicago, Illinois  60601
                     Attn: John H. Muehlstein
                     Facsimile: (312) 261-1112

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

13.5     Waivers.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Sellers in the case of a waiver by Sellers, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

13.6     Counterparts and Execution.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any counterpart may be transmitted by facsimile signature or email in .pdf format, and such signature transmitted by facsimile or email shall be deemed an original.

13.7     SUBMISSION TO JURISDICTION.  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

00667588v11

13.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Illinois (regardless of the Laws that might otherwise govern under applicable Illinois principles of conflicts of Law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

13.9    Binding Nature; Assignment.  Subject to approval of the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party (which shall not be unreasonably withheld or delayed); except that (a) Purchaser may assign any of its rights and obligations hereunder to any Affiliate or Subsidiary of Purchaser (whether wholly owned or otherwise) or to its lenders and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; (b) the rights and interests of Sellers hereunder may be assigned to a trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to Sellers pursuant to a confirmed chapter 11 plan; and (d) as otherwise provided in this Agreement.  Sellers hereby agree that Purchaser may grant a security interest in its rights and interests hereunder to its lenders, and Sellers will sign a consent with respect thereto if so requested by Purchaser or its lenders (upon approval by the Bankruptcy Court as necessary), and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code.

13.10    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns and any Persons named as an indemnitee herein, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement.

13.11    Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

13.12    Public Announcements.  Except as required by this Agreement, Law or in connection with the Bankruptcy cases, neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned.  Prior to making any public disclosure required by applicable Law, Sellers shall give Purchaser a copy of the proposed disclosure and reasonable opportunity to comment on the same and shall use their best efforts to include Purchaser's comments in such public disclosure.  For purposes of clarity, the reference to "applicable Law" in the preceding sentence does not include filings in the Bankruptcy cases.

13.13 <u>Entire Understanding</u>. This Agreement and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

13.14 <u>Closing Actions</u>. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

13.15 <u>Conflict between Transaction Documents</u>. The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

CUSTOMER FIRST COLO, LLC

By: _____
Name: _____
Title: _____

**SELLERS:**

CYBER DEVELOPMENT GROUP
INTERNATIONAL, LLC

By: _____
Name: JOHN PRESSMAN
Title: MANAGER

CRC1331 BCD MT. PROSPECT, LLC

By: _____
Name: JOHN PRESSMAN
Title: MANAGER

00667588v10      **(SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT)**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

CUSTOMER FIRST COLO, LLC

By: _____
Name: MARK A. PAPAZIK
Title: PRESIDENT

**SELLERS:**

CYBER DEVELOPMENT GROUP
INTERNATIONAL, LLC

By: _____
Name: _____
Title: _____

CRC1331 BCD MT. PROSPECT, LLC

By: _____
Name: _____
Title: _____

## EXHIBIT A
(Legal Description)

**<u>EXHIBIT B</u>**
(Material Customers)

- Huron Consulting Services LLC

- AptarGroup, Inc.

- Katten Muchin Rosenman

- Cyber Workplace Recovery Services LLC

- Network and Managed Hosting Services, LLC

- Equivoice Communications

<u>Schedule 2.1(a)(iii)</u>
Assumed Executory Contracts

**[TO BE COMPLETED]**

Schedule 2.1 (xiv)
Excluded Permits and Licenses

**[TO BE COMPLETED]**

<u>Schedule 2.3(e)</u>
Additional Excluded Assets

**[TO BE COMPLETED]**

Schedule 4.5
Necessary Consents

**[TO BE COMPLETED]**

Schedule 4.9
Brokers

**[TO BE COMPLETED]**

Schedule 4.10
Intellectual Property

**[TO BE COMPLETED]**

Schedule 6.3
Employees (Pre-Closing)

**[TO BE COMPLETED]**

